Good morning, Judge Fuentes, Judge Rendell, and Judge Roth. My name is John Brennan. I'm an attorney in New Jersey. I have an office in Spring Lake Heights, New Jersey, and I represent the appellant Mary Beth Byrne in this matter. Good morning to my distinguished counsel. I've been dealing with this case for several years with them. It's good to be here. It's good to see them again. Mr. Brennan, I have to tell you right up front that when you file a submission to this court indicating that this court can easily review proofs, that is volumes of documents, deposition transcripts, and other discovery corroborating your client's narrative, that we can easily review those proofs by way of District Court's ECF system and that you have deleted those from the record in this case for purposes of simplicity, you do no favor. I appreciate that now, Judge, and just for the record, if I could just reserve three minutes for rebuttal. Mr. Brennan. We do not easily review the appendices that are filed, let alone easily review them. I appreciate that as well. Here's the point. My thoughts when I drafted the brief-in-chief was that this was very straightforward, and I wanted to keep it very straightforward for the court. You know, if you look at my brief, you see that Judge Pisano's holding and findings with respect to reasonable accommodation are on one page, and you turn the next page, and there is my client's attested facts right to the contrary. And that is plain error. I mean, this was a summary judgment motion the District Court aired by making a finding of fact contrary to facts that were held in contention. When there's certification, are those facts that we can review? It certainly does not comply with federal statutes or federal rules or the case law in the form that it was submitted to the court. Well, Your Honor, I guess you're going to need to make that decision because – We are, and it may very well be made against you, and if we do that, there is no issue of fact, is there? Well, Your Honor, if it's made against me, then it's going to – I would respectfully submit that it's going to have to be made against the appellees on their motion papers because they used the same language, the very same language, as was utilized by me in preparing my client's certification. I mean, this – Well, that was in attaching or filing some things. Your certification has to be, under the rules, it has to meet the proofs of the defendant on a summary judgment motion, and you have to provide by way of affidavit or sworn testimony, whatever it is, that would meet that. Now, presumably, there are several volumes of deposition transcripts and sworn documents that would have done that, but instead, we have a certification that doesn't fit, so I think what they filed is of a different character. It may be of a different character, and this is not lost on me, but if you look at the strict language of the rule, that is Federal Rule Civil Procedure 56E, what it says that for the moving party, if they are going to be utilizing any documents, they have to do it by affidavit, where the documents are attested and certified to be true. So it's the same language, which brings in the statute, the 28-1746 language, which talks about substantially in this form, and that's where I would urge the Court to go if you want to decide this issue. Look, they've cited cases from the U.S. District Court of the District of New Jersey that they claim says that the District Court of New Jersey has dealt with this language and has held that certification language, which is in wide use throughout the State of New Jersey in the state courts, and I'm sure that that's not lost on this Court. They point out that some district courts have held that it's insufficient, but I've cited a case, the Reed-Elsevier case, where the District Court in Note 5 quite clearly said that it does meet the intent and the portent of the statute. And again, it's one of these things, substance versus form, and in fact, the language of the statute used substantially in this form. Let me ask a question. In your motion before the District Court, you filed the certification. Did you file the other documents, interrogatories, et cetera, that you say exist? Yes. You filed those with your summary judgment motion? Yes. That's correct. I had two appendices consisting of 67 additional documents in the District Court that were certified. Those documents were certified by a certification of mine, similar to the certifications that were submitted by opposing counsel. And there were sworn deposition transcripts of your client? There were sworn deposition transcripts of my client. But even so, the District Court found that you had not created a genuine issue of material fact. Tell me exactly how you did, because we have the defendant saying, we accommodated her, we had someone to assist her, we pointed out errors, we did this, that, the other thing. What is it your client needed that wasn't done? My client had two letters from her treating physicians that detailed, in detail, and you got to remember that I was there at that time. Just tell us what they say. They say that she needed self, it's on page, page 27 of my brief, she needed reduced stress, self-paced work. Okay, reduced stress. Correct. They gave her a person to point out what was wrong, they allowed more time. That's not correct, respectfully. That's not correct. What they did was they took Robyn Schneider, who was her supervisor, and what Robyn Schneider did was, at the end of each day, made copies of the errors that Mary Beth did. You can't say reduced stress as an accommodation. What is it specifically that you wanted? Did you want her placed in a cubicle that was separate from others? Did you want her to be, I mean, accommodations mean in the workplace there is something that physically or maybe temporally can be done to accommodate that particular disability. Now, reduced stress just doesn't do it. What is it would have helped her that they didn't do? For instance, they wanted, I'll give you a very concrete example. She needed to see her doctors on a bi-weekly basis. They did not allow her to see her doctor on a bi-weekly basis. When she went to go see her doctor. All right, where is that in the record? That is, it's in her certification. It's in her certification, and it's also in, you know, if I could go back, my problem is that I have my brief from the district court, which has the supplemental cooperative citations on it. Well, that's not going to help us much because we don't have that. Well, all I can tell you is, again, the way I viewed this case in drafting the brief was it was very straightforward to me that the judge had made findings of fact which were contrary to what she had set forth in her statements. And her statements were corroborated by additional evidence that were, if you, in my brief, you'll see that my form of briefing is that I put my citations in bold. You would see C also, and it would be citations to an exhibit which would be part of the appendix that I put in place. But I didn't believe that those were necessary for purposes of this appeal. And the reason why was because in and of itself, her statements create the genuine issue of material fact. See, for me, I don't know, for me, this is a very straightforward case, and the judge erred. He made findings. Okay, but we need to know what are the specific issues of material fact. Okay. Now, you're saying number one is that she couldn't see her doctor on a biweekly basis, although the doctors had said that she should do this. That's correct. Okay, what other? And what they did was they actually, when she went to go see her doctor and she got a note from her doctor and brought it to her, they disciplined her. Additionally, they wanted clear written instructions with verbal confirmation. Pardon me? Clear written instructions with verbal confirmation. I'm sorry, Judge, I didn't hear what you said. How to do her job. On specifics with respect to certain things. Remember, what she was suffering from was the cognitive impairment as a result of the stroke, which came as a result of the non-treated condition of the HIV and the AIDS, and she was having a difficult time with that. Extra time to complete assigned tasks, peer review to point out mistakes, flexible work schedules so she could visit her physicians for treatment, longer and more frequent work breaks. Now, you acknowledge, don't you, that when there are rules as to the time of the work day, et cetera, et cetera, and breaks, the employer doesn't have to alter those types of things that might be unreasonable in certain situations, is that correct? It might be unreasonable in certain situations. It would not be unreasonable in this situation. You were dealing with... Why and where do we find that in the record? That she... Why would it not be unreasonable in this situation to permit her to work in a way that didn't conform to the generally established work schedule for all employees? It's in her testimony. Well, I mean, where? I mean, you know, you're here to point out issues of fact, and how can we determine they're issues of fact if you don't describe to us what they are? Your Honor, I would say that she, Ms. Byrne, complained about that specific point, and in her complaint, implicit within her complaint was the notion that it could have been complied with. There, you know, it doesn't turn just specifically on that specific item of request for reasonable accommodation. Not being able to see a doctor, I thought it was a pretty serious... It's pretty serious. I mean, look, in the very beginning... No, no, no. Wait a second. It's pretty serious, but are you absolutely certain that they did not accommodate her request? They disciplined her. They disciplined her, Judge. I understand that, but the question is, are you certain that they would not let her see her doctor at all? They did not let her see her doctor. When she went to go see her doctor, she brought back a doctor's note, and they disciplined her. Well, I don't know if they disciplined her for going to a doctor or for something else, but the point is, you say they had to accommodate her to see a doctor, and they refused to accommodate that request. The request was a flexible work schedule so she could visit her physicians for treatment. Right. That was the request from the doctors. They didn't respond to that. And there were other things. I mean, for instance, the buddying up, which they claim was done. This was not a buddying up where Ms. Schneider was sitting down with Marybeth at the end of the day saying, Marybeth, here, this is what's happening. What actually happened was that at the end of the day, she would make a copy of the mistake that Marybeth had made during the course of the day, and she took those copies, did not discuss them with Marybeth, and Marybeth has testified to this, brought those mistakes to Ms. Van Dyne. Your time has really run out, but I did want to ask you one thing. Go ahead. On the retaliation claim. I mean, wasn't there a valid reason for her termination based on her having opened a supervisor's letter, having read it, made a copy of it, and put it in her purse? I believe that that presents a question of fact, Your Honor. Well, anyway, I thought maybe that's not – go ahead. It's pretextual. What they did was this. What I believe happened, truthfully, and I think the inferences that my client is entitled to give rise to this idea, is that when they found out that she had HIV and AIDS, they decided for whatever reason that she needed to – she could not work there any longer. So what they did was they created a situation where they determined – they figured in the Department of Personnel in Freehold that they could use graduated discipline. And they attempted to try to create these events. And if you look at what those events were, they were really nothing. I mean, they were making arguments – they were complaining to her – complaining about her, and she was denying what they were saying. And yet they were the ones who were making the determination to discipline her. The same people who were complaining about her were her – they were the prosecutor and the judge. But she doesn't deny that she took the confidential envelope. She denies that she – it was her job to open the confidential – it was her job to distribute the mail. That was her job. At that time, she was opening – and this is what her testimony is. At that time, she was opening the mail. She saw a memo from personnel to Eileen Van Dyne. Mary Beth denies that it was in a confidential envelope. Mary Beth saw the memo, saw that it was about her. It was about – it was an allegation that she had harassed one of her coworkers by making a demagoguery comment about the way the coworker dressed. She saw this memo. She made a photocopy of the memo. She came back to her cubicle. She was talking to her mother, the employee who was on the other side of the cubicle. And at this point, I mean, she was absolutely isolated in the workplace. The employee on the other side heard her talking about something, went, reported it to Ms. Van Dyne. Schneider – Ms. Schneider came up to her, said, give it to me. She says, I don't have it. I only kept a copy. They took the copy from her. So she made a photocopy. Schneider took the copy from her and then rifled through a stack of envelopes that were on Mary Beth's – a file cabinet next to Mary Beth's desk, found one that said confidential and said, this is the folder. That's what Mary Beth says happened. All right. We'll hear from you on rebuttal. Okay. Good morning, Your Honors. Douglas Kovats on behalf of Monmouth County Care Facilities, also identified as Department of Care Facilities. If you'd lift the mic a little, please. Certainly. Is that better, Your Honor? Yes. Just on several points. The documents as to what the plaintiff, in this instance, requested can be found in R36 and R37. Those are the two documents that we finally received after a long series of requests from the plaintiff to provide us with information concerning what accommodations she wanted. In a shorthand fashion, what she requested through her physicians as a result of what they claimed at that point in time were conditions associated with lupus. Basically, that she needed a self-paced workload, she should be able to make phone calls for emotional support, something concerning positive reinforcement feedback, patience, longer, more frequent breaks, and the ability to stand to alleviate leg cramps. Clear instructions with verbal confirmation of her duties. And a flexible schedule to visit doctors. The second correspondence from her second physician addressed no undue stress. Again, working at her own pace to be able to stand to relieve pain for leg cramps, flexible schedules for physicians, and suggesting that she buddy up with someone, I think that was their term, buddy up with someone, to identify the mistakes that she made. I understand you refused to let her see a physician, and when she did, she got, I guess, disciplined. That is not consistent with what the record shows. Well, what does it show? The record shows that on occasions she would request opportunities to go to her doctor, she was given those opportunities. The record also shows that there were certain occasions where she did not provide adequate documentation in a timely fashion. The record also shows that there was one, I guess, anecdotal incident where she basically made up a story as to where she was, not at her doctor's, and then subsequently said, oh, I was at the doctor's and got a doctor's note. Is this all in the record? I believe so, Your Honor. In the appendix? I believe it is, Your Honor. Basically, at some point in time and during the deposition of Ms. Van Dine said, you know, at some point in time I didn't know what she was telling me. And with regard to the other aspects that led to progressive discipline, clearly those are documented. There were two, I would say, leading up to the event. Number one, her overall conduct, which in and of itself alienated other co-workers. Well, that's pretty vague, overall conduct. I shouldn't say overall conduct, but in terms of where we are procedurally, Your Honor, she had a preliminary hearing, she had a final hearing, she had an opportunity to appeal. They withdrew their appeal in terms of what that document says, and there are specifications, and those materials are in the appendix. Excuse me, I keep stepping away from the microphone. Page RA-79, in terms of final disciplinary notice, talks about insubordination, conduct in becoming a public employee, other sufficient cause. There are others. Use of threats or intimidation towards supervisors and co-workers. Inappropriate language or threatening language in the workplace, creating a disturbance while on duty. Inappropriate physical contact with a resident of Geraldine Thompson Care Facility. And though those, in my mind, are relatively vague, the additional language then as to the specification details by date and the factual underpinnings. We may withdrew their appeal. That stands. That's our position. The second document, again, though there is different permutations as to what she did by way of discipline, again, in RA-2, there is, again, discussion concerning insubordination, conduct on becoming an employee, other sufficient cause, stealing or unauthorized attempt to secretly remove, conceal, or take personal and confidential mail without right or permission. Dishonesty, distrustful or untrustworthy behavior. Inappropriate or threatening language in the workplace, creating a disturbance while on duty. The use of threats or intimidation towards supervisors and co-workers. And, again, in the specification details what those things are. Again, that was combined on the appeal. They withdrew their appeal. As far as our position for this matter, that stands. And that resulted in her final termination. As far as documentation, counsel says that was in the record, our review of the record concerning the supplemental information. Excuse me. That was submitted by way of the exhibits in the appellant supplemental brief. Our review does not reveal that Exhibit D, pages 58 through 61, page 66 through 69, page 78 through 89 were submitted to the court below. And Exhibit E, all parts, on our review of the record, were not submitted to the court below. They may have been contained in exhibits, but I don't believe that they were before the district court. With regard to, again, our review is that counsel has only, or excuse me, plaintiff has only appealed that aspect of the court's findings with regard to the failure to accommodate. You will see Mr. Beekman's letter. Mr. Beekman was county counsel who handled this matter during, I guess, much of the discourse between what was going to be done by way of accommodating this individual. One of the things that he clearly said to counsel was creating additional breaks or longer break time for this individual creates a problem for us. We are a county employee. We have hundreds of employees. Most of our breaks and break times are done in such a fashion that what we provide to one, we provide to all. It's contractual. If we begin to break rank with that, I will suggest to you if you begin to break rank with that, this is not in the record, but I will suggest to you if you begin to break rank with that, you begin to create what is known as a past practice and you create a problem of undermining the contract. That was clearly articulated to plaintiff and her counsel. To the best of our knowledge, that was not objected to. In subsequent matters wherein we had an opportunity to meet with counsel, again, asking for refinement of what the accommodations might be needed for lupus, specifically referencing information that counsel had provided us by way of general accommodations that can be pulled off a website. We said we'd like some more detailed analysis. We never received more detailed analysis. In a subsequent meeting in December of 05, requesting from counsel as a result now of his claim that there were other accommodations, additional accommodations, which I submit means accommodations were provided. This is on the videotape and the video transcript and material that was provided to the court below and for this record. At any time, including in her deposition, say that there were certain tasks at work that she could not do because of your failure to accommodate? No. She did admit during the deposition that she did have difficulties performing what I would suggest are maybe core responsibilities, but not as a result of a failure to accommodate. The buddying up system that we had, you can see in pages RA17 of this record, some information way before, way before anybody can establish any knowledge on any part of the county that this individual suffered from HIV. Did you ask the question that given your disability, do you need further accommodation or are you able to do the various tasks that are assigned to you? We asked that of counsel in December and the response we received from counsel verbally was, if I need anything else, I'll give it to you in writing. We received no further writing. Did you ever get a request for further accommodation? No. Did you ever get a written statement that said you have not provided the accommodation I previously requested? We would have complaints concerning her conduct, I think related to discipline for her social conduct and a claim that there was some relation to HIV, but no clarification as to how that was or, excuse me, lupus and or HIV, but no clarification as to how that was related or how an additional accommodation would have abated her telling us truthfully where she was on any given day or the timeliness of a note. I see nothing in the record to the contrary. In regard to her termination, was this a termination on the spot because of her opening what's called confidential? No. Whether it was or wasn't or was it the... The procedure, excuse me, I'm sorry. Was it the straw that broke the camel's back? I would say probably the straw that broke the camel's back in this instance. The procedure that is generally in place depending on the recommendations of the Department of Personnel through Monmouth County is if the event is egregious enough, there is an immediate suspension. This person was placed on an immediate suspension because, in our view, it was a trustworthiness issue. As a result of that, that person was placed on an immediate suspension, then given a preliminary hearing, a final hearing, before the appointing authority. Any of those procedural anomalies that counsel complains of at this point in as of having your right to have a full hearing before the Administrative Law Judge Smirnoff. I'm sorry. Your time is running out. I just wanted you to briefly touch on Mr. Brennan's comment that there's an issue of fact over the opening of the confidential mail. I believe she clearly indicated in the record that she diverted it. But whether it was in a confidential envelope, et cetera, aren't there different versions of the same story? I don't believe so. I believe it was basically more of a diversion. And, again, to the extent that that charge I don't think can be collaterally attacked by Mr. Brennan as a result of withdrawal of his appeal. I don't think you get to double dip at it. If her certification is acceptable, do we not just have issues of fact here where you said you did X and she said you didn't? I mean, she's got to have to prove to a jury that she's correct, that you did something. But very often cases rise and fall based upon the credibility of the plaintiff, and that's the only way you can prove something. I think the wholesale cloth of I denied certain paragraphs in your materials, particularly in light of her deposition in this instance, where as I look at it there really isn't any dispute of facts. No, I'm looking at her certification where it says they said they did this. They did not. They did not accommodate me. They did not do this. There's a heat, you know, somebody says they did, somebody says they didn't. Isn't that your classic case that goes to trial? It would be, but I don't see that in this record. You don't see that in the certification that it denies a lot of the things that you're saying? I don't see a specific case-by-case denial that was overlooked by the district court in this instance. Okay. All right. Thank you. Thank you. Now, we still have another counsel for appellees. Yes? Okay. Do we have one or two more? Two more. All right. Was that just 11 minutes? Okay. All right. You have two minutes, which is going to go really fast. Thank you. Good morning, Your Honors. Ronald S. Euro on behalf of Defendant Robin Schneider. I've been asked by the court to address the aspect of the individual liability under the ADA, and the Third Circuit has held specifically in the Coslow decision that there is no individual liability for damages under the ADA. In this case, with respect to Ms. Schneider, there is no question of fact as to her stature with the County Monmouth. She was employed by the County Monmouth as a supervisor of patient accounts. She worked in the Gerald T. Thompson Care Center and was the immediate supervisor of Ms. Byrne. There is no question of fact as to that. Again, the case law has held in the Third Circuit that she is not classified as an employer for the purpose of the ADA. Therefore, there's no personal liability for damages. I think it's pretty clear, and unless there's any questions from the court, I'll step down before my time is up. Thank you. Thank you, Your Honors. Ms. Jones. Linda Grosso-Jones on behalf of Appellee Eileen Van Dyne. But additionally, as indicated in the brief, I joined in the argument presented on behalf of Monmouth County Care Centers. There is an additionally, as well as the argument made on behalf of Ms. Van Dyne, there is an additional claim made in the complaint under the LAD. As indicated in the brief submitted to this court under the LAD, the LAD claim alleges that Ms. Van Dyne was an employer. It is clear based upon the evidence presented during deposition testimony, she is not the employer. What was her title? She was the supervisor of Robin Snyder, but there was at least one person within the care center that was above her. He was an individual who was presented for deposition testimony in this matter on behalf of the Monmouth County Care Center. The LAD, which is obviously a New Jersey State statute, makes very clear that an individual supervisor is not an employer. This issue was briefed before the court below. The court below did not need to reach it because it decided overall that summary judgment should be granted for all. I would submit that the issue of that there is no liability on the part of Ms. Van Dyne or, for that matter, Ms. Snyder, has been conceded before this court as the issue has been briefed. No issue was presented in the brief submitted on behalf of the appellant in response. But the court didn't decide that issue because it didn't need to. It did not need to. That is correct. So we, because there's not a decision on that basis, it is doubtful that we would review that. Because it wasn't decided. With all due respect, Judge, I think that it is extraordinarily clear as a matter of law under the ADA there can be no individual liability on the part of a supervisor. Under the LAD, it is likewise extraordinarily clear as a matter of law that neither Ms. Snyder, and again I don't represent her, but neither Ms. Snyder nor Ms. Van Dyne can be held individually liable. And as I said, no plea, nothing was presented to this court in response to the argument, either via pleading or oral argument. And I would submit that even if this court, if this court were to reverse as to Monmouth County Care Centers, the decision should be affirmed as to Ms. Van Dyne. Thank you. Thank you. Thank you very much. I'd just like to direct your attention, the court's attention, to page 26 and page 27 of my brief, which sets forth, and this is just dealing with the letters that came from the doctors, and you've got to understand and appreciate that the doctors were provided by my office a copy of what Mary Beth's job description was so that they could make a determination what would be best for her in order to be able to perform the essential functions of her job with reasonable accommodations. And they said so in their letters. And that's unrebutted medical testimony. Additionally, in the deposition transcripts from Mary Beth's deposition, when you read through that deposition transcript, what you see is that they were continually asking her, well, did you make any other requests for reasonable accommodation? Did you make any other requests for reasonable accommodation? I kept interjecting an objection. I know you kept interjecting. Well, the reason why is because reasonable accommodation is a legal concept. But you're contending that they didn't, so she should at least be able to put on the record whether in her view they did or didn't. Well, they did. She did get some answers, but I wanted to make sure. I wanted to make sure that my record was covered with those objections because reasonable accommodation is a very broad thing under Phoenixville. I mean, it's any kind of communication that she makes that she needs help. Like, for instance, when she first told Robin Schneider, when she went into Robin Schneider's office and broke down in tears, and Robin Schneider testified in her deposition, and that was attached to my appendix about that event. She went in and she told Robin Schneider, I can't take it. My kid is homesick. You have to help me. And what did Robin Schneider do? After Marybeth asked her, please keep this confidential, because Marybeth knew. She was counseled by her doctors. Be careful who you tell about this condition. The very same day, Robin Schneider went and told Eileen Van Dyne. And then several days after that, they disciplined her for improper performance of her duties, notwithstanding the fact she had just explained to them what was going on. That is not good faith interactive process. That is not granting of reasonable accommodation. And it started from there, and then it continued to go. Now, as far as the December 28th hearing where I was talking to Mr. Beekman, when you look at that, I videotaped that. And the reason why I videotaped it is during this entire time, I was trying to impress upon these people, you have to be sensitive to this woman's condition. She needs this job. Her son is homesick. You have to be you have to. And I was trying to urge them to do that, and there was no sensitivity coming back the other side. He held up a stack of documents and said, hey, if we were, you know, this is the buddy up documents, so on, quote, unquote. The documents that they saved after every single day, where they never told her what she was doing wrong or how she could go about correcting it or anything along those lines that they were secreting to her into a file. The file was this big. It's on the videotape. He held it up, and he says, if we weren't trying to reasonably accommodate her, we would be disciplining her with this. Well, guess what? When I take Frank Tragno, the director of personnel, when I take his deposition, it comes out that in fact they had previously, to Mr. Beekman saying that, tried to discipline her on those very same mistakes. So there lays the lie. Judge, judges, this case has a plethora of genuine issues. And, you know, one of the things I wanted to stress in my supplemental brief was this idea that somehow this comes down to a credibility call. Well, maybe it does come down to a credibility call, but it's not just the bare bones of what she's saying in her certification. There are many instances in the record below of cooperative evidence that shows what it is she was talking about. Thank you. Thank you, counsel. We'll take the matter under advisement. Ask the clerk to recess court.